Eugene F. Traut, Appellant, v. Pacific Mutual Life Insurance Company, Appellee.
Eugene F. Traut, Appellant, v. Continental Casualty Company, Appellee.

Gen. No. 42,497.

Heard in
the third division of this court for the first district at the December
term, 1942. Opinion filed February 2, 1944.

CASSELS, POTTER & BENTLEY, of Chicago, for appellant; RALPH F. POTTER, LESLIE H. VOGEL and ANTHONY S. RAS, all of Chicago, of counsel.

TAYLOR, MILLER, BUSCH & BOYDEN and GEORGE C. BLISS, all of Chicago, for appellees; GEORGE C. BLISS and JAMES J. MAGNER, both of Chicago, of counsel.

MR. JUSTICE BURKE delivered the opinion of the court.

Eugene F. Traut filed separate suits at law against the Continental Casualty Company and Pacific Mutual Life Insurance Company to recover the indemnities provided for in four noncancelable accident and health policies issued by defendants by reason of having suffered a total disability to practice his profession. The defendants filed answers denying that plaintiff had suffered any disabilities compensable under the terms of the policies, and each defendant filed its counterclaim in equity to rescind and cancel the policies upon the ground that the plaintiff made certain misrepresentations in his application for the policies. By stip-

ulation the actions were consolidated for the purpose of trial and the causes were submitted to the trial court, sitting in the dual capacity of law judge and chancellor to hear and determine the legal and equitable issues. At the outset of the trial the defendants conceded the *prima facie* case of the plaintiff with reference to his injury and length of disability and the amount of indemnities due him. It was conceded by the defendants that if they were unsuccessful in their counterclaim in equity and special affirmative defenses in law, judgment should be entered for the plaintiff and against the defendant Continental Casualty Company in the sum of $1,412.50 and against the defendant Pacific Mutual Life Insurance Company in the sum of $3,427.51. At the conclusion of all the evidence the court found for the defendants and entered a decree in accordance with the prayer of the counterclaims. By stipulation of the parties the appeal of the plaintiff from the decree entered in the consolidated cases is consolidated for all proceedings on appeal. Plaintiff's theory of the case is that each and every ailment, injury or illness at any time suffered by him and not disclosed in the applications was slight, trivial and fully recovered from at the time of the making of the applications; that prior to the issuance of the policies he never had any bodily infirmity; that the matters relied upon by the defendants to rescind the policies were neither material to the acceptance of the risk nor to the hazard assumed by the defendants; and that defendants are not entitled to a rescission of the policies. Defendants' theory of the case is that in his applications for the policies of insurance plaintiff falsely answered the questions asked of him regarding ailments, diseases and infirmities which he had suffered and medical attention which he had received; that the misrepresentations were material to the acceptance of the risk or the hazard assumed by the defendants; and that by reason of the misrepresentations the defendants are entitled to rescind the policies.

On April 21, 1924 the Continental Casualty Company issued to plaintiff a noncancelable accident and health policy, by the terms of which it agreed to pay to him, if by reason of sickness or injury he should be disabled and thereby suffer a loss of business time, a certain stipulated monthly indemnity. On October 6, 1926, July 1, 1928 and April 28, 1929 the Pacific Mutual Life Insurance Company issued to the plaintiff policies of accident and health insurance containing substantially the same provisions as the Continental policy, except with regard to the amount of monthly indemnities payable thereunder. Prior to the issuance of each policy plaintiff was required to answer various questions relating to ailments, diseases and infirmities which he had had and medical attention which he had received. On each occasion he was also examined by a physician employed by the prospective insurer. On December 26, 1937, plaintiff became sick of tuberculosis and suffered a total disability to practice his profession as a physician until August 31, 1938. By reason of this illness he was confined in the Trudeau Sanitarium at Saranac lake, New York. Plaintiff gave the defendants notice of his disability and demanded payment of the indemnities provided for by the policies, but the respective defendants denied liability. During the pendency of the actions and on May 10, 1939 plaintiff submitted to an operation on his spine at the Mayo clinic, at Rochester, Minn., at which time he again suffered a total disability to practice his profession until July 22, 1939, and a partial disability for six months. Thereupon he filed his supplemental complaint in each of the pending actions to recover the indemnities provided for in the policies. The defenses made to the original complaint were extended to the supplemental complaint.

The insurance provided for in the policies was not only against loss of limb, sight or time resulting from accidental injury or sickness, but also for a limited hospital indemnity. Attached to each of the four policies

and made a part thereof was an application in two parts. Plaintiff answered the various questions propounded in each application and signed it. The second part of the application consists of declarations made to the medical examiner. In the application for the Continental policy plaintiff certified that he had "read the above statements and answers and that each of them is recorded as made by me, and I agree that they shall form a part of the contract or contracts of insurance for which I have applied." Paragraphs No. 29 and 30 of the Continental policy read, in part, as follows: "This policy is issued in consideration of the statements and agreements contained in the application therefor and the payment of premium as herein provided. Copy of the said application is hereto attached or hereon endorsed and is hereby made a part of this contract. . . . The falsity of any statement in the application, materially affecting either the acceptance of the risk or the hazard assumed hereunder, or made with intent to deceive, shall bar all right to recovery under this policy." The policy further provides for the payment of indemnities for disabilities resulting in the inability to perform work substantially essential to his occupation but not resulting in a total loss of business time. The indemnities to be paid under the latter provision are contingent upon the fact that the disability immediately succeed a period of total loss of all business time for which indemnities are payable. It is only if such partial loss of business time is preceded by a total loss of business time for which indemnity is payable that the insurer is obligated to pay one half of the stipulated monthly indemnity and then but for a period not exceeding six months. In other words, under the policy issued by the Continental, indemnities are not payable for partial loss of business time unless the disability is of such a character as results in a total loss of business time for a period of time exceeding three months and

are not payable for a period exceeding six months. In part 1 of the Continental policy interrogatory No. 15 reads: "Do you agree (1) that the falsity of any answer in this application for insurance or of any answer made to the company's medical examiner in continuance of this application shall bar all right to recovery under the proposed policy if such answer is made with intent to deceive or if it materially affects either the acceptance of the risk or the hazard assumed by the company . . . ?" Plaintiff answered: "Yes." Interrogatory No. 11 of part 2 of the application of the Continental policy asked: "Have you ever had or been told you had (e) Rheumatism, heart disease or high blood pressure?", to which he answered: "No." In this interrogatory he was also asked: "Have you ever had or been told you had (h) Any ailment, disease, injury or operation?", to which he answered: "No." He was also asked: "Have you ever had or been told you had (i) Observation or treatment in any hospital, sanitarium, or other institution?", to which he answered: "No." Immediately following the last answer appeared a heading, reading: "Name Ailments-Dates-Durations-Results-Doctors," to which he answered: "Sprained ankle: Oct. 1923: Not disabled: Full recovery. Sprained ankle: 1913: Not disabled: Full recovery. Influenza: 1918: 3 weeks: Dr. B. Herrich, Presbyterian Hosp: Chicago, Illinois: Full and complete recovery. A cold: About Dec. 1923: 4 days: Complete recovery. Sore throat: Dec. 1923: 1 week: Full recovery. Tonsils removed 1915 and again Feb. 1924: Few days disability each time. I had some of the usual diseases in childhood."

Clause No. 28 of the Pacific policy reads: "Insurance under this policy is effective in consideration of the payment in advance of the premiums herein provided for and in further consideration of the statements made in the application for this policy, copy of which application is attached hereto and is hereby

made a part of this policy. The falsity of any state-
ment in the application, materially affecting either the
acceptance of the risk or the hazard assumed here-
under, or made with intent to deceive shall bar all right
to recovery under this policy. . . . Failure to com-
ply with any of the provisions of this policy shall
render invalid any claim under this policy." Inter-
rogatory No. 15 of the first part of the application for
the Pacific policy asked: "Have you ever had or have
you now any bodily . . . infirmity . . . or are
you in any respect . . . in unsound condition . . .
physically?", to which he answered: "No." He was
also asked: "Do you agree that the falsity of any an-
swer in this application for insurance or any answer
made to the Company's Medical Examiner in continu-
ance of this application for insurance shall bar the
right to recover thereunder if such answer is made
with intent to deceive or materially affects either the
acceptance of the risk or the hazard by the Company?"
He answered: "Yes." In the second part of the ap-
plication for the Pacific policy issued September 27,
1926, he was asked: "5. Have you ever had or been
treated for: (i) Lumbago, Rheumatism?", which he
answered: "No." This interrogatory was subdivided
so that the applicant was required to answer as to
various specified diseases and ailments listed from (a)
to (j), inclusive. Immediately following the answer to
(j), appears the following: "Give name, history, date
and duration of each disease or symptom." He an-
swered: "Bone in right hand broken: 1915: 2 weeks:
Complete recovery: Dr. A. D. Lewis, Chicago, Illinois.
Tonsillectomy: 1917: 1 week no complications: Dr.
Jordan, Chicago, Ill." He was then asked: "Have
you given full information about each disease or symp-
tom mentioned above which you have ever had or been
treated for?" He answered: "Yes." In interroga-
tory No. 6 he was asked what injuries or illnesses, or
treatments by or consultations with physicians or

practitioners, he had had during the last seven years, and also to give particulars of each illness, injury, consultation or treatment, date, duration, result and physician's name and address. He answered: "Influenza: 1918: 4 weeks: Pneumonia complicating: Full and complete recovery: Dr. C. H. Grulee, Chicago, Illinois. Right arm broken: 1904: 6 weeks: Complete recovery." The policies issued by Pacific on July 1, 1928 and April 28, 1929, including the answers to the interrogatories in the applications, are substantially the same, so far as the issues in this case are concerned, as the policy issued on October 6, 1926.

Each of the four policies contained a clause granting the insurer the right to renew to the anniversary date of the policy nearest his sixtieth birthday. This type of policy is known as a noncancelable policy. The application for the Continental policy differs from the applications for the Pacific policies. In the latter applications the long list of ailments appeared in interrogatory No. 5 with a question as to whether or not the applicant had ever suffered any of the listed diseases. Interrogatory No. 6 of the Pacific applications (asked by the medical examiner) limited the inquiry as to what injuries or illnesses or treatments by or consultations with physicians or practitioners the applicant "had during the last seven years." However, the first part of the Pacific applications required the applicant to answer, "have you ever had any bodily infirmity or are you in any respect in unsound condition physically." The burden was on the Continental to prove by a preponderance of the evidence that the alleged misrepresentations made in the application were material to the risk or the hazard assumed by the defendant. In that policy (Continental) the question read: "11. Have you ever had or been told you had . . . (h) Any ailment, disease, injury or operation? (i) Observation or treatment in any hospital, sanitarium, or other institution?" Continental alleged that plaintiff

had failed to disclose that in the years 1913, 1914 and 1915 he suffered an illness or disease of sciatica and consulted physicians therefor in 1914 and 1915, and that he had been under treatment at St. Joseph's hospital for that illness in 1914 and in the Presbyterian hospital in 1915. The burden was on Pacific to prove by a preponderance of the evidence that the plaintiff had at the time of answering the interrogatories, or previously during his lifetime, any bodily infirmity, or that he was at the time of the application for the policies, in unsound condition physically. Pacific maintains that it established that plaintiff made representations which were in fact false and were material to the risk or hazard assumed, and that he had been in two hospitals during the years 1914 and 1915 for a chronic condition of sciatica. As to the Pacific policies, in considering the evidence, we have confined our inquiry to whether there was a misrepresentation in plaintiff's negative answer to the inquiry: "Have you ever had or have you now any bodily infirmity or are you in any respect in unsound condition physically?" In resolving the case against Continental, we have considered only the evidence bearing on the negative answers to the questions: "Have you ever had or been told you had any ailment, disease, injury or operation?" or "Observation or treatment in any hospital, sanitarium or other institution?" Plaintiff maintains that each and every ailment, injury or illness at any time suffered by him and not disclosed in the applications was slight, trivial and fully recovered from at the time of the making of the applications; that prior to the issuance of the policies he never had any bodily infirmity; and that the matters relied upon by the defendants to rescind the policies were neither material to the acceptance of the risk or the hazard assumed by the defendants. He urges that the decree is not supported by the evidence and that it is against the manifest weight of the evidence. Defendants answer by

stating that the decree is fully supported by the evidence; that it is not against the manifest weight of the evidence; and that the matters inquired about and the facts not disclosed were material to the risk. The parties are in agreement that it is necessary for the defendants to establish that the matters inquired about and the facts not disclosed were material to the risk.

The brief of the Continental asserts that in an equitable proceeding, to cancel a contract of insurance it is not necessary to prove that the material misrepresentation was made in bad faith or with an intent to deceive, and that all defendants were obliged to prove by a preponderance of the evidence was that plaintiff made certain misrepresentations which were in fact false and material to the risk or the hazard assumed by the defendants. We are of the opinion that this contention is sustained by the authorities. In *Western & Southern Life Ins. Co. v. Tomasun,* 358 Ill. 496, the court said (502):

"In an equitable action for the cancellation of an insurance policy upon the ground that misrepresentations had been made as to facts material to the risk, it is not essential that the applicant should have willfully made such misrepresentations knowing them to be false. They will avoid the policy if they are, in fact, false and material to the risk even though made through mistake or in good faith."

The sole point raised by the plaintiff is that the decree is against the manifest weight of the evidence. The presumptions are in favor of the decree entered by the trial court and the burden is upon the plaintiff to show from the record that the decree is against the manifest weight of the evidence. We turn to a consideration of the evidence.

Plaintiff is a physician with offices in Chicago and Oak Park. He was born May 23, 1894. Prior to September 1913 he attended high school at Fond du

Lac, Wisconsin, where he engaged in athletics. He played football in high school and was captain of the team. He also competed in throwing the weights and in interscholastic track meets. In vacation he worked for a railroad, doing heavy manual labor in preparation for his athletic activities in the Fall. Because of his participation in interscholastic track meets he came to know the University of Chicago and was encouraged to enter that university. He was granted a scholarship, dependent upon his averages. His participation in athletics determined whether he would continue to receive the benefit of the scholarship, or whether someone with an equal or slightly higher average would receive the benefit of the scholarship. The scholarship carried him through the university during four years. He participated on the freshman football squad during the Fall of 1913. In practicing football he was on the field at 3:00 p. m. The squad had some light work in punting and receiving punts and in sprinting. Plaintiff was a lineman. After some experience tackling the dummy, the linemen were separated and were told to push heavy carriages, which were weighted with rocks, around the field. Following that, the squad had scrimmage. He was on the field until about 9:00 p. m. In order to keep in condition he played against the varsity in basketball after the football season closed, and when the basketball season closed he resumed weight throwing. His events were the discus and the hammer. In the Summer of 1914 he was asked to and did take care of an insane man under conditions which would put him in good shape for football in the Fall. The insane man had caused a lot of trouble with other persons who had been taking care of him by physical violence and the work required a husky specimen of mankind. The evidence shows that plaintiff was sufficiently strong to take care of the insane man. He participated in the track meets. Toward the termination of his school

career in 1916 or 1917 he attained the height of his proficiency in throwing the hammer and discus and established a new A. A. U. record in the hammer event, which occurred prior to the departure of the Olympic team. The hammer is a 16 pound weight on a wire, and "you stand in a 7 foot circle and whirl this weight around your head, while you rotate on your left heel, which has a spike in it, driven into the cinders, and you rotate on that as many times as you can. It is preferable to rotate three times, and then you release the hammer, gathering as much momentum as possible. In doing that the left leg is pivoted and it takes the most strength." He enlisted in the Naval Reserve at Great Lakes Training Station, at which time he was given a thorough physical examination for gunner's mate, and was accepted. When it was found that he had registered at a medical college the authorities of the Navy sent him back to that college to continue with his education. He was transferred out of the gunner's mate rating and made a pharmacist's mate. He graduated from medical school in 1918 and was admitted to practice in this State in 1919. After serving his internship, he opened an office for the practice of medicine. He first went to Fond du Lac, Wisconsin to practice. He remained there six weeks and came to Chicago, where he became connected with Rush Medical College. He went to Europe in 1924 and while there spent most of his time in Vienna, where he studied under two medical professors. He was there between one and two years. Since then, except for the period of disability for which he sues, he continued to practice his profession. After 1918 he averaged four days and four nights exercising in a gymnasium and played tennis on Sundays. He is a bachelor. He played volley ball and hand ball. From 1915 to 1929 he was actively engaged in these athletics. In 1933 or 1934 he won a medal for his proficiency in playing hand ball. On November 30, 1935 he was involved in

an automobile accident. On the occasion of a hunting trip at night the car in which he was riding ran off the road and turned over. He was thrown against the left door of the car and the man in the seat next to him fell upon him, in the course of which his back was struck with such violence that he broke the left scapula (shoulder blade). He was taken to the West Suburban hospital that night and was released the next morning. Somewhat subsequent to that he noticed pain in the back, constant and with increasing severity. The pain was in the lower back. He discovered that after this accident he no longer had power in his left foot to jump while playing volley ball. The left foot would not push him upwards in an effort to jump at the net. He had continued with his athletic activity right up until then. In December 1937 he went to the Trudeau Sanitarium, Saranac lake, New York, where he was treated for tuberculosis and where he remained until July 14, 1938.

During the summer of 1913 plaintiff experienced some sort of a pain in his back or leg. His father took him to a local physician. At the time he entered the University of Chicago, in September 1913, he weighed 175 pounds. His weight dropped to 150 pounds in less than a year. He undertook to play football, but encountered difficulty bending over in the line. The condition of his back was "quite a hinderance." While attending the university at various times he was under the care of Dr. Charles McKenna, Dr. Wilber E. Post, Dr. John Porter and Dr. Billings. At the request of Dr. McKenna he entered St. Joseph's hospital, where X-ray plates were made. He was under the care of Dr. McKenna for nine months. He consulted Dr. Post in June 1914, complaining of a pain in the back of his left hip. The pain was aggravated when the leg was straight out from the body. There was tenderness over the left sciatic nerve. During that summer his tonsils were removed. He

saw Dr. Post again on January 2, 1915. He told Dr. Post that he had not been free from sciatica at any time since the last summer and that he had been worse in the Fall of 1914. He also stated that he could not sit long and felt better when he was standing. He told Dr. Post that the pain extended from the back of the thigh and leg into the foot at times. Dr. Post diagnosed plaintiff's ailment as ''a type of neuritis, which is called toxic and which may be the effect of a cold or a chill.'' He pronounced the ailment as ''sciatic neuritis.'' Plaintiff entered the Presbyterian hospital March 20, 1915 and was discharged March 26, 1915. The record of the hospital shows that his case was diagnosed as ''left sciatica.'' The record of the hospital under the heading ''complaint'' reads: ''Pain in the left leg; sharp and aching in character, intermittent when sitting or lying down, present during night but changing position several times can get pretty good rest while in bed. Always begins deep in the posterior position of hip and extends to ends of toes. Always most severe in hip. Does athletic work every day in basketball, football and track work and when first begins work the pain is made worse but when becomes 'warmed up' does not interfere with his work unless he stoops or rotates the legs outward suddenly. Pain becomes worse when he is constipated and is relieved by bowel movement. Relief by hot applications of any kind. Relieved some by medicine from Dr. Post (thinks it was salicylate). Duration about 20 months. Tenderness over posterior portion of left leg. Felt only when pressure is made on the part when patient stoops or leg is extended. Present along a definite line from hip to knee below which it is spread over posterior and lateral portions. Same duration as pain.'' Dr. Raulston testified the original hospital record was in his handwriting. Plaintiff testified that from 1915 to 1924 he did not have any difficulty with his back or leg, nor did he have any difficulty

with his back or leg when any of the four policies was issued. Some time during the months of March and May 1931, X-rays of plaintiff's back were made at the West Suburban hospital. He testified that at that time he must have had some trouble with his back. The films were not produced at the trial. The roentgenologist who testified at the trial did so by reference to letters written at or about the time the films were made These films show, among other things, a "lipping or over growth" between the fourth and fifth lumbar vertebrae. This roentgenologist testified that the films disclosed the spine to be perfectly normal in appearance and that there was no evidence of spondylolisthesis. On June 13, 1931, while attending the American Medical Convention in Philadelphia, plaintiff was examined by Dr. Ralph Pemberton, one of the foremost authorities in the country on arthritis. Plaintiff complained to Dr. Pemberton of pain in the course of the left sciatic nerve and along the lower lumbar spine. This is the same location as shown in the earlier medical histories. Plaintiff told Dr. Pemberton of the beginning of the pain at the age of 18 in his left hip and that at the age of 20 he noticed a discomfort in the lower lumbar spine. At this time (June 1931) plaintiff in bending had pain in his mid-dorsal region and in the sacroiliac joint. He had pain in the lower lumbar region when he bent forward. There was a limitation of power in his left foot. Dr. Pemberton thought plaintiff had a form of arthritis. Plaintiff gave another medical history to Dr. Adrian Verbrugghen at the Presbyterian hospital in February 1934. The original hospital record bearing Dr. Verbrugghen's initials is in evidence. In February 1934 plaintiff told him of a "history of sciatic pain for 15 years." This carries plaintiff back to 1919 and antedates every policy sued upon.

In May 1939 plaintiff went to the Mayo clinic at Rochester, Minnesota, where he was operated on by

Dr. Melvin S. Henderson. On examination Dr. Henderson found a diminished tendo-achilles reflex in the left leg. This was the same condition Dr. Pemberton found in 1931. Plaintiff also gave a history that for 20 years following 1913 and 1914 he had back trouble and occasional left leg pains. Dr. Henderson testified he took into consideration this history of pain in the left leg and back in the years 1913 and 1914 and the continuance of that pain for 20 years in his diagnosis of the case. Dr. Henderson operated on plaintiff's back and found an intraspinal lesion of the fourth and fifth lumbar vertebrae, with evidence of pressure on a nerve root in the spinal canal. He testified that there was a protrusion at the fourth lumbar interspace of a good sized piece of intervertebral disk on the left side; no protrusion on the right side; that the pain down in the leg could be accounted for by the protrusion of the fourth intervertebral disk pressing on the nerve root on that side. Dr. Henderson attributed the pain in the back to the spondylolisthesis and the pain down the leg to the protrusion of the fourth intervertebral disk pressing on the nerve root. It was his opinion that the trouble was traumatic in origin. In his opinion, based upon a reasonable degree of medical certainty, the trouble he found at the time of the operation might or could have been caused by the automobile accident. "Interspinal lesion" means evidence of pressure on a nerve root in the spinal canal. "Spondylolisthesis" means a slipping forward of one vertebrae on another, displacement, forward or backward. "Sciatica" is associated with protrusion of any of the lumbar intervertebral disks, and according to Dr. Henderson, a protrusion of an intervertebral disk is believed to be "probably the chief cause of sciatica." Dr. Henderson and Dr. Craig operated on plaintiff. The operation consisted of two parts. The spinal cord was exposed by lifting up the bony canal posteriorly, and it was found that on the left side of the spine there was

a protrusion at the fourth lumbar interspace of a "good sized piece" of intervertebral disk; that there was no protrusion on the right side; that there was marked hypertrophy of what is called the ligamentum flava, which is one of the ligaments giving support to the spine. The nerve root was stretched out over the disk and was two or three times larger than it should be, due to swelling. It was Dr. Henderson's opinion that the protrusion of the intervertebral disk had existed for some years, but he did not know how long. The ligaments and disks were removed on the left side. The operation was completed by transplanting a piece of bone from the tibia to the spine, a sort of splice, to give support and fixation (in order to correct the slipping, or the spondylolisthesis). Dr. Henderson testified that plaintiff was discharged from the clinic on July 7, 1939. At that time his general condition was satisfactory. Plaintiff was advised to wear a brace for one year. Dr. Henderson stated that it is usually a year before the bone graft is firmly healed and that he advised his patient to restrict his activities for six months. He testified further that the technical part of the operation was successful, but that he had not seen plaintiff since the operation to know his "present condition."

The policies sued upon were issued in consideration of the statements made in the applications. Whether a representation is material "is determined by the question whether reasonably careful and intelligent men would have regarded the facts stated as substantially increasing the chances of the event insured against, so as to cause a rejection of the application or different conditions." *Hancock v. National Council of Knights & Ladies of Security,* 303 Ill. 66, 71. Plaintiff points out that from 1915 to 1924 there is not a syllable of testimony that he sought the advice or treatment of a physician on account of any condition of the back, and that during this period he actively par-

ticipated in athletics. He argues that the discomfort he suffered during his school years resulted from exposure and from the strain of physical effort and was not of such a character as could be considered, medically or otherwise, as a serious condition which would have caused the slightest doubt in the mind of an underwriter regarding his insurability. Plaintiff states that during the next period from 1924 to 1931 there is not a word of concrete evidence that he consulted a physician on account of any discomfort in his back, or that he had any such discomfort; that, in fact, the evidence shows that he continued his active interests in athletics and continued to practice his profession with success; that in a period of 16 years, from 1915 to 1931, he was free from any back condition and had entirely recovered from the sciatica resulting from an exposure and was an ideal risk for both defendants. Plaintiff also calls attention to the fact that in 1931 Dr. Pemberton diagnosed his condition as arthritis and that this is the first time there is any indication in the record that he was suffering from this ailment. Plaintiff asserts that the sciatica of which he complained in his college days had entirely disappeared prior to the issuance of any of the policies, and that the condition of which he complained in 1931 was something entirely different. He maintains that there is no evidence in the record showing a causal connection between the sciatica and the arthritis. It is clear that in 1914 and 1915 plaintiff was suffering from sciatic neuritis, and that this was a chronic condition. The seat of the difficulty was in the lower lumbar region and extended down the left leg to the toes. His right leg was not affected at any time. It is true that the X-rays taken at the West Suburban hospital early in 1931 did not show the protrusion at the fourth lumbar interspace of a piece of intervertebral disk. It will be recalled that Dr. Henderson, who operated in 1939, and who is the only witness who actually saw the condition, attributed the

pain down the leg to the protrusion of the fourth intervertebral disk pressing on the nerve root. In his opinion this·was of traumatic origin. Plaintiff suggests that the condition found by Dr. Henderson in 1939 was due to the automobile accident in 1935. After the accident X-rays were taken of plaintiff's shoulder, showing no definite evidence of fracture or dislocation of the bones of the shoulder. No X-rays were taken of the lumbar region of the back and apparently plaintiff made no complaint of any injury to his back as a result of this accident. As a result of the accident he made a claim against defendants for hospital indemnity. He stated that the accident occurred on November 30, 1935; that the injury received was a rupture of the left scapula, with multiple bruises; that he was confined to his home for three days, and that he returned to his place of business December 3, 1935. In the report signed by Dr. Potts relative to the automobile accident, it is stated that the injury received was a small fracture of the left scapula, shock and bruises, and that the patient was able to resume part of his work on December 9th. Plaintiff continued with his practice with the exception of the time he was in the sanitarium for tuberculosis and when the operation on his back was performed at Rochester. There is testimony that the intervertebral disk, being cartilaginous, would not show up in the ordinary form of X-ray; that Lipiodol is a dye that is injected; that it casts a shadow which outlines the disk; that this is a comparatively new ˚discovery, and that the use of it is technical and requires great skill. Defendants urge that ordinary X-ray films, such as were taken in 1931, and without the use of Lipiodol, would not disclose the protrusion of the intervertebral disk.

It is clear that early in 1931 Dr. Traut was suffering from some ailment in the back. That is the reason he had X-rays taken at the West Suburban hospital. The history which he gave to Dr. Pemberton at Phila-

delphia in June 1931 shows that plaintiff had not recovered from the ailment suffered in 1913, 1914 and 1915. In 1934 he went to the Presbyterian hospital to seek relief from this ailment. At that time he gave a history of sciatic pain for 15 years. The evidence convinces us that the accident which plaintiff suffered in 1935 did not bring about the condition for which he was operated at the Mayo clinic in 1939. We are satisfied that the evidence warranted the trial court in finding that the sciatic neuritis from which plaintiff suffered in 1913, 1914 and 1915 was chronic and that it continued until the operation at Rochester in 1939. The evidence shows that the sciatic neuritis was caused by the protrusion of the intervertebral disk on the left side. This would not be disclosed by the X-rays taken in 1931. It is true that Dr. Pemberton testified that in his opinion in 1931 plaintiff was suffering from arthritis. Dr. Pemberton did not take or direct the taking of X-rays. The diagnosis of Dr. Pemberton is support for plaintiff's contention that the sciatica from which he suffered in his school years disappeared before he applied for the policies of insurance. The sciatic pains were symptoms of some fundamental disorder. A reasonable inference from the testimony is that the cause of sciatic neuritis from which plaintiff suffered from 1913 on, was the condition of the disk of his lumbar vertebrae. Plaintiff did not disclose in his applications that he had been in two hospitals during 1913 and 1915 for a condition of chronic sciatica. In our opinion the evidence sustains the finding of the trial court that the misrepresentations made in the applications were material to the risk or the hazard assumed by the defendants. The evidence refutes the contention of plaintiff that he had fully recovered from the ailment at the time he signed the applications, and shows that the ailment grew steadily worse and that he did not fully recover until his operation at Rochester. As to the policy of the

Continental, he was asked whether he had any obsér-vation or treatment in any hospital, or whether he had been told he had any ailment or illness. We agree with Continental that his answer was an untruth, an evasion or a concealment and that he was not called upon to give an opinion. He was called upon to state facts. In the applications of the Pacific, he was asked whether he ever had or if he then had any bodily in-firmity, or if he was in any respect in unsound condi-tion physically, which he answered in the negative. In our opinion, the sciatic neuritis from which he suf-fered was an infirmity. The testimony makes that quite clear. It should be remembered that at the time he answered the interrogatories in the applications he was a physician. Our view is that the decree is sup-ported by the evidence and that it is not against the manifest weight of the evidence as to either de-fendant. Accordingly, the decree of the superior court of Cook county is affirmed.

*Decree affirmed.*

KILEY, J., concurs.

HEBEL, P. J., took no part.